Our next case is United States v. Louis Holger Eklund, case number 21-30240. There are bona fide issues here, and I apply a standard of review to those issues, and applying that standard of the review of those issues, I may even not agree with what happened below, but given the standard of review, I may come out the same way they did. That's all I'm trying to lay out. But even if we agreed, it seems to me one could put your client in prison for longer than he's now expected to get out. I mean getting his competence exam, taking extra competency evaluations, taking all it takes to get him up to snuff to try to do a new trial, all of that kind of stuff. I'm not sure that's what you want, and that's why I really like that question. It is a difficult question. I agree. I'm not sure. I don't think it's my responsibility as appellate counsel to, at this stage, make decisions based on what I think is in my client's best interest when I have a record below that I believe does reflect plain error, which is the standard of review on the part of the district court. It seems to me that appellate counsel, trial counsel, you have to always act in the client's best interest, right? Would you agree with that? Of course. I didn't mean to suggest otherwise. Okay. So, I mean, and this sometimes comes up in these sentencings when we remand, let's say, for a sentencing that's a little bit different here because you have some conditions that we will get to. But if it were determined that he was not competent to stand trial, and we'll certainly talk with the U.S. attorney as well, if that were determined, then he would either need treatment or otherwise to have yet another trial. So that's where I'm really rubber meets the road as a practical matter. And, of course, even when these competency proceedings occur in the first instance in the district court, we don't know how they're going to end, whether a defendant is going to be found incompetent, unable to be restored to competency, and then what happens after that. And there is a statutory scheme in place to address what happens after that. Well, if on this remand the court were to determine that after that 15-month period that Mr. Holger was competent, then, of course, we would just be looking at these other trial issues. That's right. But I'm concerned because you fairly raised that the psychiatrist talked about, Dr. Becker said, here's my view, but it's tenuous, and that was before COVID and before the delay. So I just want to be clear that one of the things you're asking us to do is to remand for a competency hearing. I don't think there is an option on a record that reflects a defendant who was tried when he was incompetent to stand trial and represented himself when he was not competent to waive counsel. I understand the practical concerns, but I don't know how you get around that. He has a felony conviction that imposes some very severe consequences going forward, and he is still on supervised release. And so although his custodial portion of his sentence is nearly over, there are a great many consequences that have still attached to the fact that he was convicted and tried. Tried and convicted, all the way around. Ms. Krause, let's jump into the competency analysis a little bit more. As I understand it, the diagnosis was about his delusional thinking, and that seems to be a through line throughout this period. But Dr. Becker, in that period for the first competency hearing, or no, I guess the second one at that point, said tenuously competent. I understood that to mean that competency isn't about releasing someone of their delusional thoughts, but being able to cabin them in a way that it doesn't interfere with his ability to understand factually and rationally the nature of the legal proceedings. Would you agree with that, or do I have that right? You do have that right. I do agree with that, and I would focus the Court's attention on the word rational. What is a rational understanding of the proceedings? And in this case, it is complicated because Mr. Holger's delusional disorder is very intertwined with the facts of the case and the fact that there being a trial. It was not rational of him to think that he could use his trial to air his delusional beliefs about the atrocities committed against Native children by the State of Alaska. Well, can I ask about that because I see this case in two phases. You've got the 15-month phase when he was tenuously competent where there seems to be a number of filings made to the Court that would suggest or perhaps raise doubt as to his competency. And then you've got, as the government argues, this trial phase when he seems to be able to perform in many ways that one would think allow – suggest competency with opening statements and cross-examination and conducting voir dire and other things. How do we analyze – how do we analyze that portion of it? Does that suggest to us that we can overlook the prior 15 months or not? It does not, and I will explain why, if I may. First of all, the two questions about competency to stand trial and competency to waive counsel are separate issues, but they are related. And they're related in terms of the question of whether the Court was obligated or the Court plainly erred by not sua sponte ordering another competency evaluation. And that turns on whether a reasonable judge would have had a genuine doubt about Mr. Holker's competency. The question of competency is – What does that mean, a reasonable judge? I mean, my worry about that is this. We're at plain-error review. Yes. None of his counsel has asked for that. He has not asked for that. That's why we get to such a low level of review, plain error. When you said, what a reasonable judge, is that just in the eye of the beholder? I mean, my worry is we got to – I don't think any one of those judges in Alaska are unreasonable. What is a reasonable judge? I mean, to me, that's a bit higher than the normal plain-error review, which if it's normal plain-error review, it's got to be so dang plain, you can't – not just one guy might think of it different, but if he's reasonable, that's okay. I think that standard was met in this case. Well, I understand you think it was met, but I guess I'm trying to figure out. I mean, my normal – I'm a standard-er review guy. I'm up here on appeal. I was a DJ once, and I had these guys telling me I didn't know what the heck I was talking about. I like that standard-er review because then I can make some decisions myself. So what is a reasonable judge? I mean, if we undo the competent and say they needed another competency hearing, it seems just normal to me that I'm pretty well stuck on he probably didn't have enough competency to waive his counsel. I mean, it just follows dead long. Then I'm in a bad way. So I'm hitting you with the real problem that I have. There's no question. The Dr. Becker says, this is not for sure, but in my book, this is what it is. And there's no question that in the 18 months between then and the Feretta hearing, there were a lot of signs of incompetency. That's exactly right. And if I'm a reasonable judge, do I automatically force myself then to do something? Is there a case that says the reasonable judge would automatically do that? Oh, yes. There are several cited in my brief. One is United States v. Turner. That's a 2018 Turner. There's two Turners. Well, but Turner, I looked at Turner. I'm not sure it really gets there. There is, however, a case that kind of says, and it's this Maxwell v. Roe, says a competency determination was 13 months old based on an aging psychiatric evaluation. The trial court would have been unreasonable in relying solely on the stale competency evaluation. Now, there, Maxwell v. Roe, it's my colleagues, and they're substituting their own opinion for that of the poor old DJ again. But it was circuit precedent. But it is circuit precedent. And here's why I don't think, respectfully, you have to get too caught up in the reasonable judge portion of the analysis, and this is why. If you remember, and the court has already recalled the testimony of Dr. Becker, saying that Mr. Holger's competency was tenuous, fluid, likely to change without medication, which everybody knew he wasn't taking and would not take. And here's the litmus test for knowing. And, by the way, the stressors of time, and you need to get him to trial quick. This was her testimony in January, the end of January 2020. And the district court even said, the district court even asked, would it be fair to say that if the court finds him competent, that would be in his best interest to have a relatively prompt trial after that finding? Dr. Becker answered, absolutely, because we have this fluctuation. And then the prosecutor responded by making sure that Dr. Becker, who was in Alaska, a private practitioner in Anchorage, would be available to do another evaluation around the time of trial or even during the trial if the court ordered it. So that was the testimony. That alone, I think you can, that raised a genuine doubt. The fact of the passage of time, based on that alone, you don't even need all those filings, the 153 filings that came in the 15 months after that. Let me circle back to my earlier question then about the conduct at trial. Because you have other cases like Audette and Johnson that would seem to suggest that if someone is able to perform these functions at trial, opening statements, cross-examination, discern the evidence, make objections, which he was able to do with all of those things, that we wouldn't overturn a court's decision not to order a competency hearing sui sponte. So that's where I'm a little bit torn about this. I understand your points, that leading up, and then there's another set of, or a few cases that describe or suggest that when the rubber meets the road and they're at trial and he's able to do these things, then maybe he was competent enough to perform it. Add to that question, survive the Feretta hearing. Yes, I will address both. I mean, all of that is in his question. Great question. I won't have to ask it. I'm happy to address both. And my response, Your Honor, is that Mr. Holger's performance during trial may, if at all, influence the court's view of whether he was competent to represent himself. It doesn't go at all to whether he was competent to stand trial. And second, aside from the competency to waive representation, which, by the way, the district court did not reconsider at all, the district court skipped over that step, there is an issue of the validity of his waiver that arose in the month or so before this trial began. And his trial performance has nothing to do with the validity of his waiver of counsel. And I just have to add, because I find that it's a very interesting fact in the record, that when the jurors went out to deliberate, they sent out one question, and that question was, has Mr. Holger's competency to stand trial been evaluated? I know jurors aren't looking at a legal standard, but I think that does shed a little bit of light to those of us reading the transcript who weren't present in the courtroom to have a little bit of insight into actually how well he presented his case. On the Ferretta issue, and I think you're referring to that course, you know, the statements of I'm being coerced into doing this. The district court then said, well, listen, we'll put you on the stand under oath, and let me ask you directly, are you being coerced? And he said no at that point. You know, I think there was some hemming and hawing. What do we make of that? Is that enough to overturn a voluntariness finding for clear error? Well, the question is whether his waiver was unequivocal. And when he made straight unequivocal answers, the few times that he did that, that happened after the court took a recess. I think it's fair to read the record as perhaps out of frustration because he wasn't answering questions directly. There's a recess. Then he starts to answer the questions directly, and when the judge starts to announce her findings that he has voluntarily, intelligently, knowingly waived his right to counsel, he interrupts to blurt out coercion, coercion twice. He says this. It was picked up by the court reporter. Apparently the judge didn't hear it. To her credit, the prosecutor alerted the court that that is what he said in the midst of this. And then at the end of that colloquy, Mr. Holger said that Jesus Christ promised him that if he represented himself, he would prevail. So I think that those interjections, those interpositions, I think that creates an equivocal record. If we take your point that competency to represent yourself is distinct from competency to stand trial, if it were determined that we should not send it back for another competency hearing, then the competency to stand trial would fall out, correct? And we would be into the competency to represent yourself. Yes, that's correct. If the district court plainly erred by not sua sponte, ordering another competency evaluation, then the case goes back. If the court finds the record as a whole doesn't lead to a definite and firm conclusion that a mistake had been committed, he appeared to be competent during trial, then you still go to the waiver of counsel question, and this issue of whether he equivocated or not, I think the record shows that he did. His filings and his statements show equivocation. He should not have been allowed to proceed to trial without counsel. And that would result in a new trial. It would because it would be a Sixth Amendment violation for him to have represented himself at trial. Okay. Do you want to reserve some time for rebuttal? Okay. Thank you. Thank you. Good morning, Your Honors. Counsel, may it please the court, Ms. Morgan Walker for the United States. In this case, the defendant stalked two victims. He believed that they were part of a vast conspiracy to kidnap and do horrible things to children. That was an apparently, was a clearly firmly held belief and apparently sincerely held. But as the defendant's own expert opined, that delusional belief about the state of Alaska and about child kidnapping did not rise to the level of a mental illness that made the defendant incompetent to stand trial. The defendant himself testified that he was competent, and it's notable that the defendant did that at a key moment in the trial. And this is sort of omitted from the briefing, but it's a key point because it goes directly to one of the questions from the panel, which was the circuit authority regarding whether a court is unreasonable by relying solely on an aged psychiatric evaluation. But that's not what happened here. In fact, in October of 2019, Judge Gleeson ordered the defense counsel, the standby counsel, to file a notice regarding whether the defendant wanted to testify against the pending cell motion. And it was that moment when the defendant's demeanor noticeably changed in court. That's not clear from the black and white record, but that is in fact what happened. And if you closely read the transcript, that is what emerges. So in November of 2019, the defendant testified at great length, and ultimately at 2 ER 256, Judge Gleeson asked him very pointedly, are you asking me to reconsider my decision that you are incompetent? And he said, yes, that's exactly what I'm asking you to do. And then he went on to say, by the way, I'd also like my own independent evaluation. And the next day at 287, the court ordered that evaluation, and that's what yielded the Becker psychiatric evaluation. So it's also important to note that Dr. Becker didn't merely say that he was competent. She didn't merely say he was able to waive counsel. And, by the way, the government respectfully disagrees with the defense on this. From our perspective, Feretta clearly establishes those are the same standard. If a defendant can stand trial, the defendant can represent himself. There's simply no daylight between those two decisions. But the point is, when Dr. Becker said that he wanted to represent himself, she went out of her way to say this is a volitional decision. That's at 9 ER 1705. She knows that he's doing this volitionally. So then she testifies. And at that point, I'd ask the court, and I really appreciate Judge Smith pointing out the deferential standard here. It's plain error. I'd ask this panel to put itself in Judge Gleeson's shoes. Here she is. It's just before the pandemic. No one knows at that point the pandemic is coming. But Dr. Becker testified at length about why it is that a person can hold delusional beliefs about the political system but nevertheless be competent to stand trial. So if he may have been competent to stand trial at that point, but the two key facts that you left out of the recitation of Dr. Besker are, though, her statement that he's competent, quote, although tenuous, and get him to trial right away. So we don't have a right away, thanks to COVID, 15 months later. And given those two very key aspects of her statement, why wouldn't that additional competency hearing have been in order? The answer, Your Honor, is because the additional evaluation wasn't necessary because of what Judge Gleeson did do. And that's why it's critical to closely examine the record. So that was January of 2020. The pandemic begins raging. We get to November of 2020. Judge Gleeson held a virtual scheduling conference. That's at 3ER 497. So Judge Gleeson can not only see the defendant, she can hear the defendant. The next month, December of 2020, a telephonic status conference. She can hear the defendant again. 3ER 500, January of 2021. We're now only three months out from trial. There's another virtual status conference. Again, the court can see and hear the defendant. But then it's not, you know, reading the defendant's brief, one would get the impression that Dr. Becker testified, hey, Judge Gleeson, you need to get this defendant to trial as quickly as possible. Then the defendant was isolated for 14 months during a pandemic and then was dropped into voir dire. And that is not what happened. No, I mean, it actually is a little bit worse for the government than that because I think there were some 150 filings to court during that period of time, many of which from just the description in the briefing suggests that he continued to harbor this belief about the conspiracy and with state officials and wanted to prove that in court. So I take it the virtual hearings, did they ever get into those filings themselves or do anything that would suggest some type of evaluation about his competency? Yes, Your Honor. If I could sort of respond to a few aspects of that. The short answer is yes. If the court goes back and looks at the transcripts, the court is genuinely responding to the issues he's raising, number one. Two, those hearings don't simply stop in January. The court holds three in-person hearings, one in March, two in April. So Judge Gleeson is seeing this defendant three times in person before voir dire begins. But then if I could address your specific question, the answer here is actually governed by Ninth Circuit precedent, and if I may quote Neal, this is on page 22 of my brief, quote, competency will not be questioned when a defendant merely displays rude, uncooperative, and sometimes wacky behavior. Likewise, voluminous filings of nonsensical pleadings do not create per se serious doubt about competency, unquote. No, but I mean what I don't find Neal to be so apt is that Neal did not involve someone who was diagnosed with a serious mental condition of delusional thinking, nor did Neal involve someone who had already been declared incompetent to stand trial previously. So it's these filings, these irrational filings, in conjunction with that type of diagnosis in history that I think makes Neal maybe not the best example of it. I take your point, you know, voluminous filings on their own may not suggest it, but what about these other factors? Your Honor, I would simply, if I could, I would point to the other cases on page 23 of my brief. Again and again and again, the Ninth Circuit is confronted with defendants who hold sovereign citizen extremist beliefs, and that's exactly what this defendant held. The only thing that makes this case a little bit more complex is that in addition to holding sovereign citizen extremist ideology, the defendant also has a delusional disorder. But the case law is clear on both points. Simply holding bizarre beliefs or being a believer in conspiracy theories does not render a defendant incompetent to stand trial. Let me ask you, Ms. Walker, the question that we posed to Ms. Krauss, and that is if the court were to determine that an additional competency hearing should have been held, so the case is remanded, what is the procedure in Alaska for that? Your Honor, I think what would happen, the defendant would have to be transferred from his present location, which is not in Alaska, to Alaska. I assume there would have to be some sort of hearing in the district court in order for the court to then decide what type of hearing to hold. The court, if the government so, I suppose it depends on exactly what the Ninth Circuit did. If the Ninth Circuit held that Judge Gleeson abused or committed plain error by not sui sponte holding a competency hearing, the district court would have to determine whether there was statutory authority to order a hearing to retroactively determine whether the defendant was competent at the time. And, of course, we know from many cases that that happens, and sometimes the competency hearing encompasses a time period which is way more extensive than 15 months. I mean, they go back for years in some of these. So let's say there's this competency hearing. Would he then be transferred to one of the government facilities where these occur, or in your view, would it just be a retrospective review on the record? Your Honor, from our perspective, it would really be up to the district court at its first instance to craft something, depending on how the Ninth Circuit rules. So from one sort of most efficient procedure would be, hypothetically, for Dr. Becker again to go back and look at the trial record and render an opinion. But then that would, of course, give the defendant an opportunity to disagree. So if the opinion were adverse to the defendant's position on appeal, he might request another evaluation by another expert. I don't know what expert he would choose or where that person would be. But if that opinion were adverse to the government, the government might elect to move for a forensic examination, which are typically only done at two BOP facilities far from Alaska. Practically speaking, it would mean a very long delay. And could I ask you, both as a constitutional and a practical matter, if the case were remanded and by the time the court could schedule this hearing, he's released, could he actually be ordered to one of the detention facilities where these examinations are determined? Yes, Your Honor. My recollection of the statutory language is that it's a mandatory detention because the authority that the circuit would be relying on, I assume, is the provision of law regarding mandatory detention of a person for purposes of evaluation to determine if they are competent to stand trial. Such a person must have counsel, they must have appointed counsel, and that's exactly what happened below. But then in order for the government to do the evaluation, practically speaking, we have to get them somewhere. And I certainly can't speak for BOP, but my understanding is BOP can do basic competence evaluations in almost any facility. So the closest to Alaska would be SeaTac right here. If there were a need for a plan for restoration, I think he would have to go to either Butner or Springfield. Thank you. So, counsel, this is not necessarily my first look at this kind of a difficult situation. I had it in United States v. Kowalski, and in that case we went back to United States v. Meeks, which is 987 Fed Second 575, and looked at what they did there. My worry is that if one is bound to need another competency evaluation and one were to find that the judge should have done it based on what happened from the time of the last one to the time he goes to the Pareto hearing, that at that point one then puts in jeopardy, if you will, his waiver of counsel as well. In that instance, not having the competency evaluation would make the waiver of counsel, even in the Pareto hearing, a little uneasy, because at that point, if you look at Meeks, Meeks had a competency evaluation. He was found competent, but we decided in our authority that it didn't matter. His mental situation was such that he was unable to impliedly waive his right to counsel at trial. What do we do with that? Your Honor, the government asked the court to apply the standard, which is plain error, and to closely examine— But again, that happened in Meeks, and they said even though he was competent and even though there seemed to be a fine Pareto hearing, nonetheless that defendant was unable to impliedly waive his right to counsel at trial through his conduct. Your Honor, the government's response would be to urge this court to go back and closely look at the record, because from our perspective— Can somebody not have a competency evaluation and still be able to waive his counsel? Of course, Your Honor. Most defendants who successfully get through a Pareto hearing and waive counsel are competent, and they've never had a psychiatric evaluation. If I could apply my understanding of Meeks to the present situation, here's how we would differentiate it. First of all, I'd ask this court to please put yourselves in the shoes of Judge Gleeson in March and April of 2021. She has seen this defendant many times. She's been sued by this defendant repeatedly based on his sovereign citizen extremist ideology. She has had to deal with his frivolous filings, all of which are based on his sovereign citizen ideology. She's familiar with him. She's familiar with the community. There are many people in Alaska who hold beliefs like this, and courts are well-versed in distinguishing between those who are genuinely mentally ill and unable to understand what's happening in a courtroom versus people who hold extremist beliefs but nevertheless understand that they're on trial. So Judge Gleeson, there she is. April 14, I filed a request asking the court to conduct another Pareto inquiry, and the reason I did that was because the defendant was laying the record for this moment, hoping the Ninth Circuit would look at his shenanigans and his baiting of Judge Gleeson and find that she made a mistake. So Judge Gleeson asks him questions going to whether he's making a knowing, intelligent, voluntary waiver, and he wasn't on the stand, Your Honor. He was sitting at counsel table, and so when he uttered the word coercion, certainly this is not a trial. I can't testify, but I was sitting adjacent. I was sitting at the next table and was able to overhear him say, in my view, very deliberately, just loud enough so that Judge Gleeson couldn't hear him, but the court reporter could, utter the word coercion twice as she was reciting the Pareto finding. So I interrupted and I said, Your Honor, I'm sorry, but this is what just happened. She insisted he immediately stand up and raise his hand. And if you just go back and look at that transcript, I would submit that there's almost no judge, no district court judge, who could be in that position and infer that the person in front of them doesn't understand the proceedings. Judge Gleeson reached the right conclusion, which is that this is a very intelligent defendant. He's a very manipulative defendant, and he was so committed to having this jury trial as a mechanism to sort of air his views that I would really urge the court to closely analyze this because Judge Sanchez, if I could go back to one of your questions, there was a question to counsel about the defendant using the trial to air his sovereign citizen ideology, but that's the key. He didn't. All of his frivolous filings before trial, all of his eagerness to get into that courtroom and have observation in public, that for him was immensely important. And he was quite insulted at the idea that he was incompetent, and he was very troubled by the idea that he wouldn't have a trial. But once he got into that courtroom, it was not a circus. It was anything but. He objected to folks in voir dire, made an extremely cogent opening statement directly to the causation element, a fairly sophisticated argument, saying, yes, of course, of course they suffered substantial emotional distress, but it's not because I caused it. It's because they learned the truth of their oppression of me, and I'm going to show that. And he specifically told the jury, I'm going to cross-examine these witnesses. They're not credible. They're overstating their case, and they're biased. And then he went through every single one of those government witnesses and cross-examined them. In fact, he cross-examined the first witness, FBI agent Sandy Kline, so effectively that Judge Gleeson, at sentencing, ordered an amendment of the pre-sentence report because she said, look, government, the cross-examination was so successful that your theory of the evidence was that he'd made countless calls. In fact, it was far fewer. It's kind of unclear how many, but it's more than two. That is the opposite of incompetence. Let me ask this, Ms. Walker. I mean, I take your point, and I tend to agree that the trial didn't seem to devolve into a circus atmosphere, but I was looking for this in the record, and he does submit a jury instruction. This is at ER 1683, where he brings up, I guess, his theory about the sex trafficking ring and how Native American children are being kidnapped with the complicity of state officials. So he was, I guess my question would be, he's getting some of that through or trying to into the trial, and it seems as if that delusional belief hasn't gone away. Maybe it's being a little more strategic. Tell me why you think that that isn't enough to demonstrate incompetency. Your Honor, it's because extremist political views do not make a person crazy. And if I would submit, if I could sort of analogize to the larger context of our country right now, there are many people who adhere to QAnon ideology, people who believe conspiracy theory is very similar to the defendant. Many of those people committed various crimes at the Capitol on January 6th. They might not have been already subject to two competency evaluations with some tenuous competency. So he's in a very maybe category of one situation. I wouldn't quite compare him to the January 6th group. And in that, I think what troubles me is this passage of time. And I'm not sure that the ability to represent himself actually solves the competency issue. And you had suggested, well, there's no daylight between the two. What do you think is the best case that would support that position? Ferretta, Your Honor. Ferretta itself. And if I may. And I have another question, and perhaps the presiding judge will permit it. But just jumping to the end of the case, I was also troubled by the delegation to the probation officer and whether it really complied with Nishida having the probation officer be able to determine or have the authority over the nature and extent of the mental health treatment. That's something I haven't seen before. What is the support for that given what we've been told in Nishida? Your Honor, if I may, that's 62 of my—and I do say them over time, but if I may answer this question and then conclude. So we have a fairly thorough argument here. It's really focused on page 62. But in essence, what the court ordered is the defendant shall obtain a substance abuse assessment and participate in any recommended treatment. That's a reference not to the probation officer. That's a reference to the provider. And so the problem in Nishida was that the district court essentially delegated that authority, that finding, to the probation officer alone. But that's really the opposite of what Judge Gleeson did. She said you've got to get an assessment and then you have to follow the recommendations of the treatment provider and then was specific to avoid, in Nishida, the problem of saying both residential and— I read the language to say he's directed to approve it and also to decide the nature and extent. And you're saying no, that's solely with the treatment provider, not the probation officer? Yes, Your Honor. And if I may, the reason I submit that that's consistent with Nishida, on page 63 of my brief, just quoting Nishida, the last clause there, the first paragraph, page 63, it is permissible to delegate to the probation officer the details of where and when the condition will be satisfied. Where and when? Right. So in other words, I would submit we're actually going above and beyond Nishida, but in any event, the court didn't violate Nishida. Thank you.  Yes, Your Honor. I had a little bit of a concern about this and wanted to get a little clarification. I understand the no contact order, there seems to be a statutory basis to provide, not only for the victims and witnesses, but their immediate family members. I don't see anything in the text of the statute that would extend that to coworkers. And so, you know, setting aside First Amendment arguments, what's the authority to order no contact with the coworkers of victims and witnesses? Your Honor, the reason the court has the authority to do that is because on this record, Eklund had contacted the victims by communicating indirectly to their coworkers. And so if I could direct the court to page 66 of my brief, there's a citation of the record there where one of the things Eklund did is after he was ordered not to communicate with Carla Erickson, the first victim, he communicated with Ms. Erickson's colleague and then wrote the note, you know, please communicate this message to the victim, victim one, Ms. Erickson. So from our view, the authority is simply the statute that says, hey, look, the court can craft a reasonable order to say don't communicate with these victims. And what Judge Gleeson did is simply just looked at the evidence as to how Eklund had stalked these two victims and said, well, look, the way you did that is communicated to their office. And by the way, that's especially important for the native village of Kotzebue. You know, speaking as an Alaska AUSA, I would urge the court to take into account that Kotzebue is a very small community and when the defendant directed that terror at Ms. Stoops, he's doing that by really terrifying everyone in the office. And so Ms. Stoops testifies at trial that what she's afraid he's going to do is show up at the office and she's having thoughts about how do I protect my coworkers as he kills them coming for me. Is there a possibility that we could narrow the potential scope of that no contact order so that it expresses that you can't contact coworkers for the purposes of harassing the victims and witnesses? As it stands now, it's just no contact to coworkers at all. It seems pretty expansive in that sense, but I'm wondering what you think. Your Honor, from a constitutional perspective, it's not expansive because it's still a time, place, and manner restriction. It only lasts three years. But in terms of the practical relationships here, there's just no good reason for Mr. Eklund to be communicating with the coworkers of Carla Erickson or Nicole Stoops. Nicole Stoops is no longer the president of the native village of Kotzebue. So we're talking about small communities here. There's simply no plausible justification for him contacting anyone who's closely associated with these victims. And realistically, if the court were to remand an order of the district court to amend the order, the problem is the government would be in the position of trying to enforce that order, having to prove that his subjective intent was to harass, which really puts us back in the same position of being back at trial and essentially prosecuting him again for future cyberstalking, which is the whole reason Congress gave judges this authority was to preclude contact so that the government wouldn't have to again prosecute cyberstalking or 875C threats. So we'd ask the court to not do that. Any other questions? Thank you. Thank you very much. Ms. Crouch, we've been a bit liberal with this time with this case. I think you have some time left over. I do, but I'll wrap it up. No, no, no. If you want a little bit of extra time, you can have a couple of extra minutes. Thank you. I appreciate it. I don't want to. There are many other issues that the court got to that I also want to respond briefly to. But just to circle back to the question about what happens if there's a remand for reevaluation, the statute is 18 U.S.C. 40241. And what it says is that the defendant can be committed to the custody of the attorney general to be restored to competency after a hearing and a finding by a preponderance of the evidence that he may be incompetent to stand trial. So if the case were remanded after or whenever Mr. Holger is released from custody, he does not necessarily remain in custody. That evaluation can take place with him out of custody. Then, if he is found to be incompetent, then there may be a question of how a restoration goes forward. But I don't think it's a – I know, looking at the statute, it is not a situation where he has to remain in custody while the initial competency evaluation is complete. You know, that might not be true. But I suppose, given the possibility of the way the statute works and the way it typically works where individuals are sent for evaluation, and should it be determined that he was incompetent, that he would generally remain in custody with appropriate treatment, all I'm suggesting is that you reaffirm with your client that he is open to a remand for a competency hearing. I understand, Judge. Thank you. And I will just remind the Court, of course, that if the conviction is reversed, whether because the record leaves you with a definite and firm conviction that a mistake has been committed as to his competency, or because the jury – he was unable to use all of his peremptory strikes because of the method of jury selection that was sprung on Mr. Holger the morning of trial, or because of the cumulative error of the numerous trial errors that are alleged in the brief, and then a remand altogether of the conviction, not just for a competency evaluation or just for the conditions of supervised release, then that's an entirely different situation. What is your answer to counsel's argument that this judge was involved with this defendant throughout this period of time, had several hearings where the defendant was in front of her, had a chance to see this defendant, to question this defendant, to see what this defendant was doing and what this defendant was about, as it relates to these, if you will, many letters that he sends, such that this, now we would say reasonable judge, could decide whether they needed another competency evaluation? There's nothing in the record that indicates, for example, that Judge Gleeson had even recalled Dr. Becker's testimony 15 months before. So while I do agree that some weight, Judge Gleeson is entitled to some weight in what she is observing firsthand, I don't think, there's nothing to say that she looked or considered other aspects that she should have been considering in addition to those filings that proposed for Dyer. A month before the trial, there was, Mr. Holger tried to subpoena everybody that he thought was involved in a conspiracy against him, including the prosecutor. And Judge Sanchez, I think you used the word, through-line. And what you have to remember, and what I think Judge Gleeson didn't remember, and I don't blame her, it was a long time, it was a pandemic, this was a difficult case that she was dealing with, was that Dr. Becker said that, and I want to just detour briefly, I think it is unfair to characterize Mr. Holger as simply somebody who has sovereign citizen ideology. Two doctors, Dr. Becker and Dr. Beck, both said that the diagnosis of delusional disorder and how that delusional disorder affects his competency to proceed to trial is distinct from his fringe political beliefs, whatever you want to call them, it doesn't matter what you call them. Their diagnosis didn't depend on that. And so when Mr. Holger, the through-line is this, it's not just the jury instruction that he filed at the end of the case. It was his opening statement when he said, this trial is my way of using the public record to expose the truth. So his delusional disorder, not fringe political beliefs, were driving his entire approach to the trial, which went to his factual understanding of the trial and what the trial would be about for him. So that's how I would respond to the question of, does the record show that he was competent to stand trial? Well, if the question Dr. Becker's litmus test was, if he believes he can use this trial to air his delusional beliefs, that would indicate to you that he's no longer competent. His tenuous competency has now shifted to incompetency. And he was doing that all along, but especially in the last couple of months before the trial began. And I think a reevaluation, not just because of the passage of time, which I think alone justifies, based on her testimony, another evaluation, but all the conduct that happened. I do want to, if there's, I'm happy to entertain more questions about the competency issue, but I just want to respond very quickly to the other two issues that the court raised with counsel. And that is, with respect to Nishida and the unlawful delegation, Nishida itself addresses, because the government argued, no, this isn't a delegation to the probation officer, it's really to the provider. The provider is going to oversee the treatment. And Nishida rejected that. I think there have been many cases, both at the circuit level and also in the district court already, where these conditions of release have been remanded for clarification, because it's an unlawful delegation. The way these two conditions are written, I don't think can be fairly read any other way, but the probation officer is empowered to direct Mr. Holger into inpatient mental health treatment or substance abuse treatment, and this is an unlawful delegation, and I'll leave it at that. With respect to the no contact order, it may very well be that there are reasons, good reasons, for an injunction prohibiting Mr. Holger from contacting many people. But this was an order under 1514. It's a very narrow statute. The statute says victims and witnesses to protect against harassment. The definition, and I erred in my brief by challenging family members because those are included as immediate family members under the reference to the assault statute, and so I apologize for that. But with respect to co-workers, there is no authority. That is a broad restraint of Mr. Holger's First Amendment rights. Co-workers of four people, Ms. Erickson, her husband, Ms. Stoops, her husband. Co-workers, wherever they work, wherever they go, it's not allowed under this statute, and it is a prior restraint on speech because the order says no contact whatsoever, not indirect, direct. It is not just a time, place, and manner restriction. It is a content-based restriction. Actually, a content-based restriction in a way, if it restricted only harassment, we wouldn't be here arguing about this. But the order says he can have no contact whatsoever. I can't fathom a reason that a citizen of Alaska would be prohibited from contacting anybody at the Alaska Department of Law for any reason. I mean, that's a public service organization. So I think that order is too broad, and if there are people in the community who have a reason to seek some kind of protective order, then there are other state laws that can enable them to do that, but not this one, not 1514. Okay. Thank you, Ms. Krause. Thank you, counsel, both for your very helpful arguments. The matter will stand submitted.
judges: McKEOWN, SMITH, SANCHEZ